FIRST NATIONAL BANK OF OMAHA, a national banking association, and First of Omaha Service Corporation, a Nebraska corporation, Plaintiffs,

v.

The MARQUETTE NATIONAL BANK OF MINNEAPOLIS, a national banking association, and St. Paul Fire and Marine Insurance Company, a Minnesota corporation, Defendants.

No. 4–79 Civ. 94.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 12, 1979.

Mackall, Crounse & Moore by Clay R. Moore, Minneapolis, Minn., and Swarr, May, Smith & Andersen by William E. Morrow, Jr., and Donald J. Buresh, Omaha, Neb., for plaintiffs.

Levitt, Palmer, Bowen, Bearmon & Rotman by J. Patrick McDavitt, Minneapolis, Minn., for defendants.

## MEMORANDUM ORDER

ALSOP, District Judge.

This matter comes before the court upon the motion of the defendants to dismiss the First, Second, Third, Fourth and Fifth Claims for Relief, to the extent that these claims are based upon lobbying and litigation activities, for failure to state a claim upon which relief can be granted (Fed.R. Civ.P. 12(b)(6)) or in the alternative for partial summary judgment (Fed.R.Civ.P. 56) on these claims. Briefs were submitted by both parties and oral argument was heard on August 3, 1979.

## BACKGROUND

The present suit is an outgrowth of prior litigation in which the roles of the litigants were the reverse of the above caption. *See The Marquette National Bank of Minneapolis, et al. v. First of Omaha Service Corporation*, Minn., 262 N.W.2d 358 (1977), *cert.*

*granted*, 436 U.S. 916, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), *aff'd.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978).

Plaintiff First National Bank of Omaha ("First National") is a national bank with its charter address in Omaha, Nebraska. It operates a bank credit card program ("Omaha BankAmericard/VISA program") in various states, including the State of Minnesota, with the assistance of its wholly owned subsidiary, Plaintiff First of Omaha Service Corporation ("Service Corporation"). Defendant The Marquette National Bank of Minneapolis ("Marquette") is a national bank with its charter address in Minneapolis, Minnesota, which, until 1978, also operated a bank credit card program ("Marquette's BankAmericard/VISA program") in the State of Minnesota.

In the latter part of 1975, plaintiffs began a systematic effort in the State of Minnesota to enroll residents, merchants and banks in the Omaha BankAmericard/VISA program. At that time, Marquette had a virtual monopoly in the bank credit card business in Minnesota. It was the only card issuing bank in that state and over 80% of the credit cards issued to Minnesotans were issued by Marquette.

The interest rate structure of the program solicited by plaintiffs was 18 percent per year on the first $999.99 and 12 percent per year on amounts of $1,000.00 and over. At that time, Marquette's interest rate structure on its BankAmericard/VISA program was a flat 12 percent per year. Marquette also charged a membership fee of $10.00 per year, while First National's program required no annual membership fee.

In April, 1976, the Minnesota Legislature enacted the Bank Credit Card Act which established a 12 percent per annum maximum interest rate for bank credit card programs. This statute applied to any national bank doing business in Minnesota and provided injunctive relief for any bank operating in compliance with the statute when injured competitively by another bank which was violating the statute. It is undisputed that Marquette engaged in lobbying activities in connection with the passage of the Bank Credit Card Act.

In May, 1976, Marquette commenced an injunction suit against First National alleging that the latter was operating its bank card program without conforming to the interest rate limitations established by the Bank Credit Card Act. Shortly thereafter, the injunction suit was removed to this court by First National. Marquette subsequently filed a voluntary dismissal of the complaint as to First National, and this court then remanded the suit to state court for lack of subject matter jurisdiction.

The Hennepin County District Court then entered a temporary restraining order and later a permanent injunction enjoining the Omaha Service Corporation from operating its program in violation of the Bank Credit Card Act. Marquette was required to post a $10,000 bond as security for the issuance of the temporary restraining order.

The Minnesota Supreme Court rejected an attempt by the Service Corporation to stay the permanent injunction. On November 10, 1977, the Minnesota Supreme Court reversed the permanent injunction in a decision which produced three dissents. However, the Minnesota Supreme Court granted a stay of judgment pending application for a writ of certiorari to the United States Supreme Court on the condition that Marquette post a bond of $10,000 as security.

The United States Supreme Court rendered its final decision in the case on December 18, 1978. It affirmed the Minnesota Supreme Court's decision on the basis that, under 12 U.S.C.A. § 85, First National was authorized to charge the rate of interest permitted under the laws of the State of Nebraska notwithstanding the provisions of the Bank Credit Card Act.

The present suit was commenced on March 1, 1979, in the form of a multicount complaint against Marquette and its surety on the injunction bonds, St. Paul Fire and Marine Insurance Company. In the First, Second, Third, Fourth and Fifth Claims for Relief, plaintiffs assert causes of action under theories of antitrust, civil rights, malicious prosecution, abuse of process and tor-

tious interference with business. Under the Sixth and Seventh Claims for Relief, the Service Corporation seeks recovery from defendants of such damages as may be due and owing pursuant to the two $10,000 bonds filed by Marquette in the injunction suit.

Marquette seeks dismissal or partial summary judgment of the First, Second, Third, Fourth and Fifth Claims for Relief asserted in the complaint, to the extent that such claims are based upon Marquette's lobbying and litigation activities. This motion does not involve the Sixth and Seventh Claims for Relief. Since Marquette has submitted the affidavit of J. Patrick McDavitt and corresponding exhibits attached thereto, the court will treat the present motion as one for summary judgment pursuant to Rule 12(b) of the Fed.R.Civ.P.

When considering a motion for summary judgment, all facts must be viewed in the light most favorable to the party opposing the motion, and that party is entitled to the benefit of all reasonable inferences to be drawn from the facts. *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207 (8th Cir. 1976). Also, the right to judgment must be shown with such clarity as to leave no room for controversy and it must appear that the plaintiff would not be entitled to recover under any discernible circumstances. *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323 (8th Cir. 1973).

## THE ANTITRUST CLAIM

The First Claim for Relief alleges that Marquette violated sections 1 and 2 of the Sherman Act. Plaintiffs allege, among other things, that Marquette was instrumental in drafting and lobbying for passage of the Bank Credit Card Act, and that it did so with the intent to prevent price competition. They further allege that Marquette knew that the Bank Credit Card Act was unconstitutional, and that Marquette's lobbying activities constituted a sham to cover what was nothing more than an attempt to interfere directly with First National's business.

Plaintiffs further claim that Marquette commenced the injunction suit knowing that the Bank Credit Card Act could not be constitutionally applied to the First National and that Marquette continued the injunction suit as a deliberate and malicious sham and scheme, for the sole purpose of preventing effective price competition from First National.

For purposes of the present motion, all of the allegations in the complaint pertaining to the motives and intent behind Marquette's lobbying and litigation activities shall be taken as true. Even assuming these allegations to be true, Marquette nevertheless asserts that it is entitled to judgment as a matter of law as to these activities.

Any claim founded upon alleged wrongful conduct arising out of lobbying or litigation activities faces a threshold conflict with the constitutionally protected rights of petition and assembly. In the context of the antitrust laws, the constitutional immunity flowing from the right of petition was first enunciated by the United States Supreme Court in *Eastern Railroad Conference v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *Noerr* the court stated that:

> The Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. 365 U.S. at 136, 81 S.Ct. at 529.

In a later case, the United States Supreme Court again applied the antitrust immunity derived from the right of petition in a case involving a successful effort to influence government administrative action. *See United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Finally, in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the United States Supreme Court held that the *Noerr-Pennington* immunity also applied to anti-

competitive attempts to influence the judicial branch of government by way of litigation activities.

There is no real question in this case that Marquette's lobbying and litigation activities are generally the type of activities protected from the antitrust laws by the *Noerr-Pennington* doctrine. The dispute is whether or not First National has stated a cause of action against Marquette under the "sham exception" to the *Noerr-Pennington* doctrine.

In *Noerr,* the United States Supreme Court expressly recognized an exception to the immunity afforded lobbying activities:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. 365 U.S. at 144, 81 S.Ct. at 533.

The "sham exception" was first applied by the United States Supreme Court in *California Motor Transport v. Trucking Unlimited, supra.* The court there held that the "sham exception" was applicable to the defendant's litigation activities because these activities "were used to harass and deter the plaintiffs in their use of administrative and judicial proceedings so as to deny them full and unlimited access to those tribunals." A second factor for application of the "sham exception" was that the defendants had engaged in a pattern of baseless, repetitive claims which indicated that the administrative and judicial processes were abused.

### Marquette's Lobbying Activities

With regard to Marquette's lobbying activities, the issue presented to the court is whether those activities were a genuine effort to influence legislation or whether they were instead a mere sham conducted for the purpose of interfering directly with First National's business. In addressing this issue, the intent and motives of Marquette in relation to its lobbying activities are not a decisive factor. The court in *Noerr* stated that:

> The fact that the railroad's sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors . . . even if adequately supported in the record, could not transform conduct otherwise lawful into a violation of the Sherman Act. . . . The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot be made to depend upon their intent in doing so. 365 U.S. at 138–139, 81 S.Ct. at 530. *Also see United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and *Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288 (8th Cir. 1978).

The court must accept as true plaintiffs' allegations that Marquette engaged in the lobbying activities in question solely for the purpose of preventing competition. However, the court is convinced that that type of intent is irrelevant to the issue of whether or not Marquette's activities fall within the sham exception.

Plaintiffs cite *California Motor Transport, supra,* in support of their claim that motive or intent is crucial in determining whether or not the "sham exception" is applicable. However, reliance upon *California Motor Transport* for that proposition is misplaced. The court in *California Motor Transport* stated that purpose or intent to deprive competitors of meaningful access to the agencies or courts is a factor to be considered in determining the applicability of the "sham exception." However, plaintiffs here have not alleged any purpose or intent on the part of the defendants to deprive the plaintiffs of access to courts or agencies or any other purpose or intent to unethically misuse the lobbying or litigation processes. Clearly, plaintiffs' allegation that Marquette engaged in lobbying activities solely for the purpose of preventing competition is not sufficient to bring the "sham exception" into play and is precisely

the type of intent deemed irrelevant under the *Noerr-Pennington* doctrine.

The United States Supreme Court in *Noerr* stated that the "sham exception" did not apply in that case because the lobbying activities were highly successful. The court indicated that the success of the lobbying efforts was sufficient to show a genuine attempt to influence legislation rather than an effort solely directed to interfere with a competitor's business relationship.

The Seventh and Ninth Circuits of the United States Court of Appeals have directly addressed this factor and have held that a successful lobbying effort establishes that there was a genuine effort to influence legislative action. *See Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975) and *Subscription T.V. v. Southern California Theater Owners*, 576 F.2d 230 (9th Cir. 1978).

In *Metro Cable, supra*, the Court of Appeals for the Seventh Circuit affirmed the dismissal of a complaint which alleged that defendants had successfully persuaded the Rockford City Council to award an exclusive cable television franchise to defendants and to refuse plaintiff's applications for such a franchise. In holding the "sham exception" inapplicable, the court stated:

> In the case at bar, there is no conceivable basis for arguing that defendants' conduct was a sham rather than a genuine effort to influence legislative action. Plaintiff's injury was caused by the governmental action which defendants genuinely attempted to secure and succeeded in securing. 516 F.2d at 232.

Marquette's lobbying activities similarly do not fall within the "sham exception" to the *Noerr-Pennington* doctrine. Marquette simply exercised its right of petition and was successful in obtaining passage of the Bank Credit Card Act. Plaintiffs have not alleged that Marquette committed any unethical acts in connection with its lobbying activities. Clearly, First National's injury was caused by the passage of the Bank Credit Card Act and not by any "abuse" of the lobbying process by Marquette. Application of the "sham exception" in such a

situation would effectively preclude any party from petitioning its legislative body when passage of the act sought would interfere with a competitor's business. The Sherman Act was not intended to inhibit, in such a manner, the First Amendment right to petition.

Plaintiffs finally argue that the "sham exception" is applicable if it can be shown that the Bank Credit Card Act was unconstitutional and known by Marquette to be unconstitutional. A similar argument was rejected in *Subscription T.V. v. Southern California Theater Owners*, 576 F.2d 230 (9th Cir. 1978), where the court said:

> The *Noerr-Pennington* doctrine is based on the first amendment right of petition and such a right would be considerably chilled by a rule which would require an advocate to predict whether the desired legislation would withstand a constitutional challenge in the courts and to expose itself to a potential treble damage antitrust action based upon that prediction. 576 F.2d at 233.

The court agrees with the reasoning of the court in *Subscription T.V.* Marquette was entitled to petition its state legislature for passage of an act (even if the act was considered unconstitutional by Marquette), and is not subject to the "sham exception" absent some allegation of illegality in the legislative process or unethical abuse of the lobbying process. *See Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288 (8th Cir. 1978).

### Marquette's Litigation Activities

The next issue presented to the court is whether the "sham exception" is applicable to Marquette's litigation activities. In *California Motor Transport, supra*, the United States Supreme Court applied the "sham exception" to litigation activities where there was a pattern of baseless, repetitive claims and where the litigation resulted in barring competitors from meaningful access to adjudicatory tribunals. The question is whether these two requirements are the *sine qua non* for application of the "sham exception" to litigation activities.

The United States Supreme Court has not yet decided whether litigation activity in the context of one lawsuit is conduct which is subject to the "sham exception." In *California Motor Transport*, the court stated:

One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. 404 U.S. at 513, 92 S.Ct. at 613.

The question of the applicability of the "sham exception" to a single lawsuit was subsequently considered by some members of the court in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). In *Vendo*, a single state court case formed the basis of a subsequent antitrust claim in the federal court by the state court defendant against the state court plaintiff. The federal court in the antitrust case had enjoined the state court plaintiff from collecting a judgment which it won in the state court case.

The United States Supreme Court reversed in a decision that produced no majority opinion. The plurality opinion announced by Mr. Justice Rehnquist and joined by Justices Stewart and Powell, was grounded upon the Anti-Injunction Act. Footnote Six of the plurality opinion contains ambiguous language concerning whether one lawsuit is sufficient under the "sham exception."

Mr. Justice Blackmun, joined by Chief Justice Burger, filed a concurring opinion in which they stated that one lawsuit is not sufficient to fall within the "sham exception" and that there must be a pattern of baseless, repetitive claims.

A dissenting opinion written by Mr. Justice Stevens, in which Justices Brennan, White and Marshall joined, took the position that a single lawsuit could violate the antitrust laws and rejected any reading of *California Transport* to require a pattern of repetitive lawsuits.

Several courts have interpreted *California Transport* as requiring a pattern of repetitive lawsuits before the "sham excep-

tion" may be invoked. *See Central Bank of Clayton v. Clayton Bank*, 424 F.Supp. 163 (E.D.Mo.1976), *aff'd*, 553 F.2d 102 (8th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977) and *Mountain Grove Cemetery v. Norwalk Vault Co.*, 428 F.Supp. 951 (D.Conn.1977).

On the other hand, several other courts have interpreted *California Transport* and *Vendo* as holding that the "sham exception" can be applied to a case involving a single lawsuit and that a pattern of repetitive claims is not required. *See Associated Radio Service Company v. Page Airways Inc.*, 414 F.Supp. 1088 (N.D.Tex.1976); *Cyborg Systems Inc. v. Management Science America, Inc.*, 1978–1 Trade Cases § 61,927 (N.D. Ill.1978) and *Colorado Petroleum Marketers Assoc. v. Southland Corp.*, 476 F.Supp. 373 (D.Col.1979).

Upon reviewing the relevant cases in this area, the court concludes that one lawsuit may be sufficient in some cases to bring a defendant's conduct within the "sham exception" to the *Noerr-Pennington* doctrine. The court's reference in *California Transport* to "a pattern of baseless, repetitive lawsuits" appears to be a reference to the probative value of one claim versus a pattern of claims. However, based upon the factual circumstances of this case and the allegations made by the plaintiffs in the complaint, the court concludes that the prior lawsuit brought by Marquette against First National is not sufficient to bring Marquette's litigation activities within the "sham exception" to the *Noerr-Pennington* doctrine.

Plaintiffs have not satisfied the second factor considered by the courts in deciding the applicability of the "sham exception." Plaintiffs in *California Transport, supra*, alleged that defendants deterred them in their use of administrative and judicial proceedings so as to deny them free and unlimited access to those tribunals. The United States Supreme Court decided that these allegations were sufficient to state a claim because they amounted to an abuse of the administrative and judicial processes.

In *California Transport*, Justice Douglas also described several other types of conduct which, if used as part of an effort to influence government action, could result in an antitrust violation. The specific practices cited were perjury, use of a fraudulent patent, illegal conspiracy with a licensing authority and bribery.

The Tenth Circuit has interpreted this passage to mean that, in order for behavior to be within the sham exception, it must involve "fraud, corruption or misuse of the state processes." *Mountain Grove Cemetery v. Norwalk Vault Co.*, 428 F.Supp. 951 at 954 (D.Conn.1977).

In the present case, plaintiffs have not made any assertion that Marquette sought to bar its competitors from meaningful access to adjudicatory tribunals, that the Injunction Suit was part of a pattern of baseless, repetitive claims or that there was any unethical or abusive conduct (*e. g.*, perjury, fraud or bribery) involved in the lobbying and litigation activities. Plaintiffs do not allege that Marquette attempted to use legislative and judicial processes to directly cause some result other than that which was expressly sought and obtained in the lobbying and litigation activities. Plaintiffs alleged injury was a direct consequence of the enactment and enforcement of the Bank Credit Card Act and is not alleged to have been caused by any misuse or abuse of the legislative or judicial process.

The critical distinction drawn by the court in *California Transport* is between the concerted effort to influence public officials regardless of intent and purpose and the concerted effort to abuse the judicial or administrative process. *Associated Radio Service Company v. Page Airways, Inc.*, 414 F.Supp. 1088 at 1096 (N.D.Tex.1976). *See also Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124 (D.C.1977).

Accordingly, the court finds that the institution of a single lawsuit without any allegations that the lawsuit involves unethical misconduct similar to the abuses described in *California Transport* is not sufficient to bring the defendants' actions within the "sham exception" to the *Noerr-Pennington* doctrine.

## THE CIVIL RIGHTS CLAIM

Plaintiffs Second Claim for Relief asserts a cause of action under 42 U.S.C.A. § 1983 for injuries sustained as a result of the Injunction Suit. Jurisdiction for the § 1983 claim is predicated on 28 U.S.C.A. § 1331(a) and 28 U.S.C.A. § 1343(4). This claim alleges that plaintiffs were deprived of their right under 12 U.S.C.A. § 85 to charge finance charges or interest at a rate permitted by the law of the State of Nebraska.

In *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), the United States Supreme Court held that an action seeking relief under 42 U.S.C.A. § 1983 cannot utilize 28 U.S.C.A. § 1343(3) and (4) as its jurisdictional basis unless it arises out of the violation of a federal statute which provides for the protection of civil rights ·or equal rights. Since 12 U.S.C.A. § 85 does not provide for the protection of civil rights or equal rights, jurisdiction cannot be predicated on 28 U.S.C.A. § 1343(4). However, the various opinions in *Chapman* indicate that a majority of the court would probably allow jurisdiction for a § 1983 claim under 28 U.S.C.A. § 1331(a), assuming the § 1331 requirements are met. Accordingly, jurisdiction for this claim will be allowed under 28 U.S.C.A. § 1331(a).

It appears that the *Noerr-Pennington* immunity which this court holds is applicable to plaintiffs' antitrust claim should also be applied to a claim based upon § 1983. Since the constitutional protection afforded the right of petition overrides the legislative objectives of the Sherman Act in this factual situation, the same immunity applies equally well to the § 1983 claim. *See* "Constitutional Law: Right to Petition Rationale of Noerr-Pennington Doctrine Applied in Construction of Section 1985(1) of Civil Rights Act," 17 Washburn L.J. 202 (1978).

In *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), *cert. denied*,

434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977), the plaintiff was an Internal Revenue Agent who brought a § 1985 claim alleging a conspiracy between United States Gypsum and its officers to prevent plaintiff from discharging his lawful duties as a federal employee by making fabricated, false and defamatory charges to plaintiff's superiors concerning plaintiff's conduct of a tax audit. In dismissing the complaint on the grounds that recognition of such a cause of action would interfere with defendant's right of petition, the court stated:

> We realize of course, that § 1985(1), as we have construed it, literally could be applied here. To do so, however, would produce such problematic results that we decline to assume Congress, on a silent record and in response to very different circumstances, intended them. . . . Finding that Sherman Act liability in such circumstances would raise important constitutional problems involving the right to petition, and seeing no basis whatever in the legislative history for concluding Congress intended to raise such questions, the court (in *Noerr*) held that the (Sherman) Act could not be applied. This mode of analysis seems to us appropriate here . . . . 547 F.2d at 1344.

The court agrees with the analysis used by the court in *Stern, supra,* and concludes that the reasoning used by that court for a § 1985 action is equally applicable to an action under § 1983. Marquette's activities are not the type of activities normally condemned by the Civil Rights Act and liability based upon § 1983 would raise important constitutional problems involving the right to petition.

■ Even if the *Noerr-Pennington* doctrine did not preclude the § 1983 cause of action, there are several other reasons why this cause of action is insufficient. 42 U.S.C.A. § 1983 may provide a cause of action for deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States. In the Injunction Suit, the United States Supreme Court held that § 85 of the National Bank Act authorizes national banks to charge rates of interest in accordance with laws of the state where its principal office is located. However, it does not follow from this holding that § 85 of the National Bank Act secures "a right, privilege and immunity" within the meaning of the Civil Rights Act. The court holds that it does not.

■ Even if § 85 did create a "right, privilege and immunity" within the meaning of § 1983, it is not clear that violation of such a "right" would create a cause of action under § 1983. The United States Court of Appeals for the Eighth Circuit stated in *Chase v. McMasters,* 573 F.2d 1011 (8th Cir. 1978) that "subsequent cases have made it clear that a § 1983 action does not exist for every violation of a federal statute." In *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), four of the Justices indicated that § 1983 provides a cause of action for deprivations of all federal statutory rights. However, three of the Justices stated that § 1983 provides a cause of action only for deprivations of federal statutory rights which provide for "equal rights" or "the protection of civil rights." The court is of the opinion that the latter position is more in accordance with the legislative history behind § 1983.

Accordingly, plaintiffs do not state a claim under § 1983 since § 85 of the National Bank Act does not provide for "equal rights" or "the protection of civil rights," nor does it provide economic assistance to minorities as was the case of the statute in *Chase v. McMasters, supra.*

## MALICIOUS PROSECUTION CLAIM

Plaintiffs' Third Claim for Relief alleges that Marquette's pursuit of the Injunction Suit against the Service Corporation constituted malicious prosecution. In order to state a claim for malicious prosecution, three elements must be satisfied: (1) the suit must be brought without probable cause and with no reasonable ground on which to base a belief that the plaintiff would ultimately prevail on the merits; (2)

the suit must be instituted and prosecuted with malicious intent; and (3) the suit must ultimately terminate in favor of the defendant. *Allen v. Osco Drug, Inc.,* Minn., 265 N.W.2d 639 (1978) and *Virtue v. Creamery Package Mfg. Co.,* 123 Minn. 17, 142 N.W. 930 (1913).

Marquette claims that as a matter of law it had probable cause to rely on Minn.Stat. § 48.185 in bringing its action against the Service Corporation.

■■ Where the facts are not in dispute, the issue of probable cause and the consideration of inferences to be drawn from any given state of facts is a matter of law for the court to decide. *See, e. g., Eastman v. Leiser Co.,* 148 Minn. 96, 181 N.W. 109 (1921) and *Allen v. Osco Drug, Inc., supra.* Probable cause for pursuing a civil action consists of such facts and circumstances as will warrant a cautious, reasonable and prudent person in the honest belief that his action and the means taken in prosecution of it are just, legal and proper. *Nelson v. International Harvester Co.,* 117 Minn. 298, 135 N.W. 808 (1912) and *see Allen v. Osco Drug, Inc., supra.*

Plaintiffs allege that Marquette knew or should have known that the Bank Credit Card Act was unconstitutional and that Marquette initiated the prior action in spite of this knowledge. Assuming these allegations to be true, the court nevertheless finds that the objective facts surrounding the prior litigation indicate that Marquette did have probable cause to prosecute the prior litigation. Plaintiffs' allegations go to the element of malicious intent and do not overcome the objective factors indicating the existence of probable cause. *See Cox v. Lauritzen,* 126 Minn. 128, 147 N.W. 1093 (1914).

■ The Bank Credit Card Act expressly authorized the Injunction Suit which was instituted by Marquette. In bringing the action, Marquette was entitled to rely upon the presumption that, like all legislative acts, the Bank Credit Card Act was valid until declared invalid by the courts. *Kaufman v. Swift County,* 225 Minn. 169, 30 N.W.2d 34 (1947).

At the time Marquette commenced the Injunction Suit, no court had considered the precise issue of whether the National Bank Act preempted such a state statute. It was not until three months after Marquette commenced the Injunction Suit that the Court of Appeals for the Seventh Circuit rendered its decision in the first of the two *Fisher* cases. *Fisher v. First National Bank of Chicago,* 538 F.2d 1284 (7th Cir. 1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977). The court there held that national banks had the option of selecting between the highest rate of interest permitted by the state of its principal place of business or the state where the transaction occurred.

Between the time of the issuance of the temporary restraining order and the entry of the permanent injunction decree, the Court of Appeals for the Eighth Circuit rendered its decision in the second *Fisher* case. *Fisher v. First National Bank of Omaha,* 548 F.2d 255 (8th Cir. 1977). The court's holding in this second case was essentially the same as that of the Seventh Circuit in the first case.

In the Injunction Suit, Judge Kantorowicz distinguished both *Fisher* cases on the basis that Minnesota had a specific credit card statute governing interest rates while Iowa did not. It should also be noted that neither of the *Fisher* decisions was binding on the Minnesota Supreme Court even if they were not distinguishable from the Injunction Suit.

Marquette was thus entitled to rely upon the presumption that Minn.Stat. § 48.185 was valid, absent some express declaration by the Supreme Court of Minnesota or the United States Supreme Court that § 48.185 was preempted by the National Bank Act. *See Tucker v. Maher,* 497 F.2d 1309 (2nd Cir. 1974).

Even without a presumption of constitutionality, there can be no malicious prosecution as long as the prior suit involving an issue as to the constitutionality of a state statute is one over which legal minds might reasonably differ. *See Cobbey v. State Journal,* 77 Neb. 626, 113 N.W. 224 (1907).

In the prior litigation, Judge Kantorowicz found in favor of Marquette and granted permanent injunctive relief at the trial level. Although the judgment of the trial court, when reversed on appeal, is not conclusive on the issue of probable cause under Minnesota law, the finding of the trial court in the first instance in favor of Marquette is strong prima facie evidence of probable cause, particularly where there is no question of fraud or other improper means used to obtain the judgment. *Skeffington v. Eylward,* 97 Minn. 244, 105 N.W. 638 (1906) and *Nelson v. International Harvester Co.,* 117 Minn. 298, 135 N.W. 808 (1912). Also, three members of the Supreme Court of Minnesota would have sustained the judgment of the trial court and the United States Supreme Court granted Marquette's application for á petition for a writ of certiorari.

Based upon all these facts not in dispute, it is clear that the prior Injunction Suit did involve an issue as to the constitutionality of a state statute over which legal minds might reasonably differ. As a matter of law, probable cause did exist for Marquette to initiate and prosecute the prior action.

### ABUSE OF PROCESS CLAIM

■ The essential elements of an action for abuse of process are the existence of an ulterior purpose and an act of using the process to accomplish a result not within the scope of the proceeding in which it was issued. *Kittler & Hedelson v. Sheehan Properties, Inc.,* 295 Minn. 232, 203 N.W.2d 835 (1973) and *Pow-Bel Construction Corp. v. Gondek,* 291 Minn. 386, 192 N.W.2d 812 (1971).

"The gist of the action is the misuse or misapplication of the process, after it has once been issued, for an end other than that which it was designated to accomplish." *Kittler & Hedelson v. Sheehan Properties, Inc.,* 295 Minn. at 239, 203 N.W.2d at 840 (1973).

Plaintiffs have alleged that Marquette had an ulterior purpose in obtaining the injunction and this is taken as admitted, but there is no suggestion that Marquette tried to use that judicial process to coerce or compel plaintiffs to do anything they were not legally compelled to do, or to coerce or compel plaintiffs to refrain from doing anything they were not already enjoined from doing. The injunction only restrained the operation of plaintiffs' credit card program in Minnesota at an interest rate in excess of twelve percent and did not prevent plaintiffs from competing with Minnesota banks.

It is the court's opinion that plaintiffs' alleged injury was directly caused by the injunction and did not result from any collateral coercion by Marquette or from any misuse of the injunctive process, nor has any such misuse been alleged.

### INTERFERENCE WITH BUSINESS CLAIM

■ Plaintiffs' Fifth Claim for Relief asserts a common law theory of interference with contract or business expectancy. To the extent that this claim is based upon Marquette's lobbying activities and prosecution of the Injunction Suit, Marquette is entitled to judgment as a matter of law because these activities are protected under the *Noerr-Pennington* doctrine and do not fall with the "sham exception."

When a suit based on interference with advantageous relationship is brought against a party whose "interference" consisted of petitioning a governmental body to alter its previous policy a privilege is created by the guarantee of the First Amendment . . . and they cannot be required to compensate another for loss occasioned by a change in policy should they be successful. *Sierra Club v. Butz,* 349 F.Supp. 934 at 938 (N.D.Cal. 1972).

Several recent cases have stated that while the *Noerr-Pennington* doctrine evolved from antitrust claims, the First Amendment rights that it protects apply equally to other claims including a claim for tortious interference with business relationships. *See Pennwalt Corp. v. Zenith Laboratories, Inc.,* 472 F.Supp. 413 (E.D.Mich. 1979) and *State of Missouri v. National*

*Organization for Women, Inc.,* 467 F.Supp. 289 (W.D.Mo.1979). The court agrees with this analysis since to hold otherwise would effectively chill the defendants' First Amendment rights.

The court determines that, to the extent that plaintiffs' claims are based upon lobbying and litigation activities, there are no genuine issues as to any material facts and the defendants are entitled to judgment as a matter of law. The court is of the opinion that the order herein entered involves a controlling question of law as to which there is substantial ground for differences of opinion, and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, all pursuant to 28 U.S.C.A. § 1292(b).

Upon the foregoing,

IT IS ORDERED That the motion of the defendants for partial summary judgment (pursuant to Rule 56 of the Fed.R.Civ.P.) as to the First, Second, Third, Fourth and Fifth Claims for Relief be and hereby is granted to the extent that such claims are based upon the lobbying and litigation activities of the defendants.

IT IS FURTHER ORDERED That as to the First and Fifth Claims for Relief, the court determines pursuant to Rule 54(b) of the Fed.R.Civ.P. that there is no just reason for delay and partial summary judgment shall be entered as follows:

The plaintiffs shall take nothing from the defendant Marquette National Bank of Minneapolis on the First and Fifth Claims for Relief to the extent that such claims are based upon the lobbying and litigation activities of that defendant.

IT IS FINALLY ORDERED That as to the Second, Third, and Fourth Claims for Relief, the court determines pursuant to Rule 54(b) of the Fed.R.Civ.P. that there is no just reason for delay and judgment shall be entered as follows:

The plaintiffs shall take nothing from the defendant Marquette National Bank of Minneapolis on the Second, Third and Fourth Claims for Relief and that defendant shall have its costs and disbursements as taxed and allowed.