**SURGIDEV CORPORATION, a California corporation, Plaintiff,**

v.

**EYE TECHNOLOGY, INC., a Delaware corporation, and Robert J. Fitzsimmons, Frederick G. Kalfon, James A. Greiling and Debra J. McCoy, Individuals, Defendants.**

Civ. No. 4–85–1376.

United States District Court, D. Minnesota, Fourth Division.

Jan. 6, 1986.

Hugh D. Jaeger, Minneapolis, Minn., and Wayne Willenberg and David M. Simon (Spensley, Horn, Jubas & Lubitz, of counsel), Los Angeles, Cal., for plaintiff.

Lawrence C. Brown, Duane W. Krohnke, James L. Volling, and James C. Wine, Faegre & Benson, Minneapolis, Minn., for defendants.

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion to dismiss counterclaims brought by the defendants. Plaintiff's motion will be granted in part and denied in part.

**FACTS**

Plaintiff Surgidev Corporation (Surgidev) is a California corporation with its principal place of business in Goleta, California and is engaged in the manufacture of artificial lenses. Defendant Eye Technology, Inc. (ETI) is a Delaware corporation headquartered in St. Paul, Minnesota. Defendants Robert J. Fitzsimmons, Frederick G. Kalfon, James A. Greiling and Debra J. McCoy are former Surgidev officers and employees now associated with ETI.

This is an action brought by Surgidev charging defendants with unfair competition, misappropriation of trade secrets, breach of contract, breach of fiduciary duty, conversion, and tortious interference with contractual relations and prospective economic advantage. Surgidev is a leading manufacturer of intraocular lenses—artificial lenses implanted in the eyes of cataract patients. In February, 1985, defendant Robert Fitzsimmons resigned his position

as executive vice president of marketing and sales at Surgidev to form ETI, of which he is the president, chief executive officer, and treasurer as well as a member of the board of directors. Fitzsimmons was joined at ETI by several other Surgidev executives, including Frederick Kalfon, formerly Surgidev director of marketing; James Greiling, formerly Surgidev's north central regional sales manager; Debra McCoy, formerly Surgidev manager of manpower development; William Fagan, formerly Surgidev northeastern regional sales manager; and Myron Lippman, formerly president of Surgidev. All now hold key positions at ETI.

ETI is currently in the formative stages of corporate life, having been incorporated June 24, 1985. On August 29, 1985, ETI filed with the Securities Exchange Commission a registration statement for a public offering of 2.1 million shares of ETI common stock, intended to provide $6.3 million in operating capital. When completed, the public offering is expected to provide ETI with capital sufficient to establish manufacturing and administrative facilities. The prospectus filed with the SEC by ETI indicates that the corporation plans to engage in the business of manufacturing for sale intraocular artificial lenses.

The crux of Surgidev's complaint is that the individual defendants took valuable trade secrets and marketing information when they left Surgidev's employ to form ETI, and that in so doing each of the individual defendants contravened non-disclosure agreements which they entered into while employed at Surgidev. The trade secrets allegedly misappropriated by the individual defendants relate to technical expertise as well as confidential marketing and sales data. Surgidev seeks compensatory and punitive damages and an injunction restraining defendants from soliciting Surgidev's customers or current employees, using Surgidev's trade secrets, or competing with Surgidev in the manufacture and sale of intraocular lenses.

Defendants have counterclaimed, alleging: '

First counterclaim: Tortious Interference with ETI's public offering.

Second counterclaim: Abuse of process and malicious prosecution.

Third counterclaim: Defamation.

Plaintiff now brings this motion to dismiss each of defendants' counterclaims.

## DISCUSSION

### A. Tortious Interference

Defendants' first counterclaim alleges that plaintiff has tortiously interfered with the ETI public offering by filing this lawsuit. Elements of the tortious interference cause of action are set forth in the Restatement (Second) of Torts § 766B (1977) (adopted by the Eighth Circuit in *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir.1980)):

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement § 766B. Factors to be considered in determining whether the interference is improper are catalogued in the Restatement (Second) of Torts § 767 (1977) (cited with approval in *Missouri v. NOW*, 620 F.2d at 1316):

> In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
> (a) the nature of the actor's conduct,
>
> (b) the actor's motive,
>
> (c) the interests of the other with which the actor's conduct interferes,
>
> (d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement § 767.

Plaintiff bases its motion to dismiss defendants' tortious interference counterclaim on its first amendment right to petition government. As recognized by the United States Supreme Court in the landmark cases of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the first amendment right to petition government protects the right to bring suit in state and federal courts. Accordingly, the act of filing suit is generally privileged from tort or antitrust liability. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 380, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359 (1973). The courts have recognized only one exception to the *Noerr-Pennington* doctrine of privilege—resort to the courts which is a mere "sham" intended to disguise tortious or anti-competitive activity is not privileged. *See Noerr*, 365 U.S. at 140, 81 S.Ct. at 531. The "sham exception" to the *Noerr-Pennington* doctrine was authoritatively confirmed by the Supreme Court in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511–16, 92 S.Ct. 609, 612–14, 30 L.Ed.2d 642 (1972), and was thoroughly explored in a recent decision of the United States Court of Appeals for the Eighth Circuit, *Razorback Ready Mix Concrete Co., Inc. v. Weaver*, 761 F.2d 484 (8th Cir.1985). In *Razorback Ready Mix* the Eighth Circuit stated:

It is only where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process, that the *Noerr-Pennington* cloak of immunity provides no protection.

*Razorback*, 761 F.2d at 487, *quoting Chest Hill Co. v. Guttman*, 1981–2 Trade Cas. (CCH) ¶ 64,417, 75,054 (S.D.Ohio May 29, 1981). Thus, the filing of suit will fit within the "sham exception," and will give rise to tort liability, only if "clearly baseless," or if accompanied by perjury, fraud, conspiracy, bribery, misrepresentation, or other "illegal and reprehensible practices."

■ An analysis of plaintiff's claims reveals that they are neither clearly baseless nor characterized by "illegal and reprehensible practices." As such, plaintiff's claims are protected by the *Noerr-Pennington* privilege from tort liability. Plaintiff's first cause of action alleges that the individual defendants breached non-disclosure agreements entered into while employed at Surgidev. The non-disclosure agreements signed by each of the individual defendants prohibits just the type of conduct allegedly engaged in by the individual defendants here—misappropriation of trade secrets, hiring of Surgidev employees, and engaging in direct competition with Surgidev in the intraocular lens (IOL) industry.[1]

---

1. The non-disclosure agreements signed by the individual defendants provide that:

    5.2 **No Hiring of Other Employees.** While employed by SURGIDEV and for five (5) years after that employment ends, EMPLOYEE *agrees not to employ or attempt to employ, in competition with SURGIDEV, any of SURGIDEV's other employees* who work in any area in which EMPLOYEE has been significantly engaged on behalf of SURGIDEV.

    5.3 **No Use of Confidential Information and Trade Secrets.** While employed by SURGIDEV and for ten (10) years after that employment ends, EMPLOYEE *agrees not to en-*ter *into any employment competitive* with SURGIDEV in which the complete fulfillment of the duties of the competitive employment would inherently require EMPLOYEE to reveal or use any of the Confidential Information and Trade Secrets of SURGIDEV learned or obtained by EMPLOYEE while employed by SURGIDEV.

    5.4 **No Solicitation of Customers.** While employed by SURGIDEV and for five (5) years after that employment ends, EMPLOYEE *agrees not to divert or attempt to divert* (by solicitation or by any other means) *the cus-*

Whether the individual defendants have in fact contravened the terms of the non-disclosure covenants will of course await determination in trial on the merits, nevertheless, given the facial validity of plaintiff's breach of contract counts, it cannot be said that the initiation of this lawsuit was a "mere sham."

The remaining counts of plaintiff's complaint are also facially valid. Given the high corporate rank of the individual defendants while employed at Surgidev, it certainly does not strain the imagination to believe that the individual defendants *may* have misappropriated trade secrets, converted Surgidev documents, and otherwise engaged in unfair competition, as alleged by the plaintiff. Plaintiff has also raised a colorable claim of tortious interference—plaintiff has alleged that defendants have or will cause Surgidev clients and customers to discontinue present and prospective contractual relationships.

In sum, plaintiff's lawsuit is far from a "sham" lawsuit. The "sham exception" is a "narrow one," *Razorback Ready Mix*, 761 F.2d at 487. As recognized by the Eighth Circuit in *First American Title Co. of South Dakota v. South Dakota Land Title Association*, 714 F.2d 1439, 1447 (8th Cir.1983):

> "[t]he right of access to the courts is indeed but one aspect of the right of petition"; accordingly, groups do not [expose themselves to liability] by "us[ing] the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors."

*Id.* at 1447, *quoting California Motor Transport*, 404 U.S. at 510–11, 92 S.Ct. at 611–12. The mere fact that plaintiff's law-

suit threatens to harm defendants as competitors of plaintiff is not a sufficient ground on which to deny plaintiff access to the courts.

Further, it is extremely doubtful that the initiation of a single lawsuit can fit within the "sham exception." In *California Motor Transport* the United States Supreme Court applied the "sham exception" to litigation which constituted a "pattern" of baseless, repetitive claims. *California Motor Transport*, 404 U.S. at 513, 92 S.Ct. at 613. Several courts have construed the "pattern" language of that case to mean that a single lawsuit will not fit within the "sham exception." *See Central Bank of Clayton v. Clayton Bank*, 424 F.Supp. 163 (E.D.Mo.1976); *Mountain Grove Cemetery Association v. Norwalk Vault Co.*, 428 F.Supp. 951 (D.Conn.1977). In a concurring opinion filed in the case of *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977), Justices Blackmun and Burger stated that one lawsuit is not sufficient to fall within the sham exception and that there must be a pattern of baseless, repetitive claims. *Vendo*, 433 U.S. at 646, 97 S.Ct. at 2895. The plurality opinion announced by Justice Rehnquist and joined by Justices Stewart and Powell dealt with the issue in an inconclusive fashion.[2] The Eighth Circuit in *Razorback Ready Mix* apparently rejected a strict reading of the "pattern" language of *California Motor Transport*, stating that a single lawsuit does not give rise to liability "absent allegations that the lawsuit involves serious misconduct similar to the ... abuses described in *California Motor*." *Razorback Ready Mix*, 761 F.2d at 487. In *First National Bank of Omaha v. Marquette National Bank of Minneapolis*, 482 F.Supp. 514 (D.Minn.1979), following a thorough discussion, it was stated "the

---

tomers of SURGIDEV existing at the time EMPLOYEE's employment ends.
Plaintiff's Complaint Exhibit A (emphasis added).

2. Footnote 6 of the plurality opinion seems to state that a federal court may not conclude from the conduct of a single lawsuit that the litigation is baseless. The plurality opinion con-

cerns itself primarily with the powers of the federal courts under the Anti-Injunction Act, 28 U.S.C. § 2283, however, not with the complainant's tort or antitrust liability. Justices Stevens, Brennan, White, and Marshall, in dissent, took the position that a single lawsuit could give rise to legal liability. *Vendo*, 433 U.S. at 662, 97 S.Ct. at 2903.

court finds that the institution of a single lawsuit without any allegations that the lawsuit involves unethical misconduct similar to the abuses described in *California Transport* is not sufficient to bring the defendants' actions within the 'sham exception' to the *Noerr-Pennington* doctrine." *First National Bank of Omaha,* 482 F.Supp. at 521. Here there has been no allegation that plaintiff's act of filing suit constitutes "serious misconduct" of the type described in *California Motor Transport.* As such, plaintiff's institution of this single lawsuit is not sufficient to bring plaintiff's actions within the "sham exception." Accordingly, defendants' first counterclaim will be dismissed.

**B. Malicious Prosecution—Abuse of Process**

Defendants second counterclaim alleges that plaintiff's act of filing this lawsuit constitutes malicious prosecution and abuse of process.

■ In order to state a claim for malicious prosecution, three elements must be satisfied: (1) the suit must be brought without probable cause and with no reasonable ground on which to base a belief that the plaintiff would ultimately prevail on the merits; (2) the suit must be instituted and prosecuted with malicious intent; and (3) the suit must *ultimately terminate* in favor of the defendant. *First National Bank of Omaha v. Marquette National Bank of Minneapolis,* 482 F.Supp. 514, 522–23 (D.Minn.1979) (emphasis added). Plaintiff contends, and defendants concede, that the third element of the malicious prosecution tort has not been and cannot be proved, in that this lawsuit has not terminated in favor of the defendants. Accordingly, defendants' malicious prosecution counterclaim will be dismissed.[3]

The essential elements of an abuse of process action are the existence of an ulte-

rior purpose and an act of using the process to accomplish a result not within the scope of the proceeding in which it was issued. *First National Bank of Omaha,* 482 F.Supp. at 524. "The gist of the action is the misuse or misapplication of the process, *after it has once been issued,* for an end other than that which it was designed to accomplish." *Kittler & Hedelson v. Sheehan Properties, Inc.,* 295 Minn. 232, 239, 203 N.W.2d 835, 840 (1973), *quoting Hoppe v. Klapperich,* 224 Minn. 224, 231, 28 N.W.2d 780, 786 (1947); Prosser, *Law of Torts* § 121.

■ The difficulty with defendants' abuse of process counterclaim is that there has been no allegation that plaintiff has used the Court's processes to achieve an improper purpose. Defendants' second counterclaim alleges in conclusory fashion that plaintiff commenced this action "with the intent of *interfering with,* and *disrupting, the public offering* of ETI's securities." Counterclaim ¶ 151 (emphasis added). The initiation of a lawsuit to restrain defendants from forming a competing corporation and thereby contravening noncompete agreements to which they were parties is not an improper use of the Court's process—it is, in the words of the *Prosser* treatise, "nothing more than carry[ing] out the process to its authorized conclusion, even though with bad intentions." *Prosser* § 121 at 857. The gravamen of the abuse of process tort is the use of process to "obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Prosser* § 121 at 857. Here defendants have failed to allege that plaintiff has used the Court's process to obtain a "collateral advantage" —one outside the scope of the proceedings.[4] The purpose which defendants claim

---

3. The Court further finds that a stay of defendant's malicious prosecution counterclaim pending outcome of plaintiff's claims would serve no useful purpose.

4. The only court process of which plaintiff has made use to this point has been the issuance of a complaint. There has been no allegation that plaintiff has misused discovery or other court process. Several courts have declared that the mere issuance of a complaint, standing alone, is

806

to be improper—disruption of the ETI public offering—is collateral only in the sense that an award of the injunctive relief sought by plaintiff would hamper the ETI sale of common stock. This collateral advantage is not the result of plaintiff's improper purpose, but rather of plaintiff's diligent pursuit of its legal rights and remedies. Defendants' counterclaim merely alleges in conclusory fashion that this litigation has caused and will cause harm to the defendants without alleging any special harm other than that which normally flows from any litigation. *See Barrett v. Baylor*, 457 F.2d 119, 123 (7th Cir.1972). Absent allegations that plaintiff has willfully made use of process to accomplish a result not within the scope of the proceeding in which it was issued, an abuse of process claim has simply not been established. *Bigelow v. Galway*, 281 N.W.2d 835 (Minn. 1978); *Rosvall v. Provost*, 279 Minn. 119, 155 N.W.2d 900 (1968). Accordingly, defendants' abuse of process counterclaim will be dismissed.

## C. Defamation/Trade Libel

Defendants' third counterclaim alleges that Surgidev has falsely stated to ophthalmologists, Surgidev employees, and others in the IOL industry, that defendants have stolen trade secrets and breached their nondisclosure agreements, and that Surgidev knew these statements were false when made. Defendants contend that Surgidev made the comments with a malicious intent to injure defendants' reputation in the IOL industry and to interfere with customers and potential customers of ETI.

Plaintiff bases its motion to dismiss defendants' third counterclaim on the ground

that defendants have failed to plead special damages.[5] Generally, in a defamation case based on slander, injury to reputation is not presumed. Thus, ordinary slander is not actionable absent pleading and proof of special damages. *See* Restatement (Second) of Torts § 558(d) (an element of the tort of defamation is "either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication"). To this general rule there is one well-recognized exception: a spoken defamation which adversely reflects on an individual's abilities in his business, trade, or profession is slander per se, actionable without proof of special damages. *Restatement* § 570; *Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc.*, 352 N.W.2d 1 (Minn.1984); *Hoesl v. United States*, 451 F.Supp. 1170 (N.D.Cal.1978).

Whether defendants must be required to plead special damages in this case turns on whether their third counterclaim is more properly characterized as a claim of slander per se or one of "trade libel." Generally, trade libel is defined as a statement disparaging the quality of another's "land, chattels or intangible things." *Restatement of Torts* § 626. It is well-accepted that recovery may not be had for trade libel (or "product disparagement" as it is known under Minnesota law) absent proof of "special damages in the form of pecuniary loss directly attributable to the defendant's false statements." *Advanced Training Systems, Inc. v. Caswell Equipment Co., Inc.*, 352 N.W.2d 1, 7 (Minn.1984). Thus, if defendants' third counterclaim alleges disparagement by plaintiff of defendants' *products* or *property*, then it is a trade

an insufficient ground on which to base an abuse of process counterclaim. *See Behrendt v. Rassmussen*, 234 Minn. 97, 47 N.W.2d 779 (1951); *Blue Goose Growers, Inc. v. Yuma Groves, Inc.*, 641 F.2d 695 (9th Cir.1981); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 261 F.Supp. 691 (S.D.N.Y.1966); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 295 F.Supp. 1155 (N.D.Ill.1969); *Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.*, 358 F.Supp. 17 (E.D.Tenn. 1972); *Selas Corp. of America v. Wilshire Oil Co. of Texas*, 344 F.Supp. 357 (E.D.Pa.1972).

5. Defendants' third counterclaim alleges that:
   The Surgidev statements referred to in paragraph 157 hereof have damaged defendants in that these statements have prejudiced ETI in the conduct of its business and have deterred their parties from dealing with ETI. The amount of defendants' damages are not known at this time.
   Counterclaim ¶ 159.

libel claim and special damages must be pled. On the other hand, if the counterclaim is properly one for defamation, and if the alleged defamatory statements reflect adversely on the defendants' abilities in their collective trade or business, special damages need not be pled.

An analysis of defendants' third counterclaim reveals that it raises allegations of slanderous defamation adversely reflecting on defendants' business and professional abilities, and not disparagement of defendants' products or property. Accordingly, the Court finds that the counterclaim is for slander per se and that special damages need not be pled.[6] Defendants' allegations relate to statements concerning business ability—primarily in the nature of statements that defendants are not trustworthy or credible because of the fact that they misappropriated plaintiff's trade secrets and breached a contractual agreement with plaintiff. Nothing whatsoever has been alleged regarding the "quality" of defendants' products or property. Indeed, it would be difficult for plaintiff to impugn the quality of defendants' products, inasmuch as none have yet been produced. The Court finds that defendants' have alleged defamation relating to business ability, not product disparagement.

An analysis of the differing interests served by the two torts supports a finding that defendants' third counterclaim sounds in defamation and not trade libel. A defamatory statement is defined by the restatement as one that:

> tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Restatement § 559. Because business reputation is accorded great significance by the law, any statement adversely affecting business reputation is per se actionable. In contrast, reputation of the quality of property is not accorded such overweaning significance. Accordingly, proof of special damages is required to support the cost and inconvenience of a lawsuit.

Here plaintiff has allegedly impugned the business reputation of defendants. As such, special damages need not be pled. Nor is an order of the Court requiring defendants to amend their third counterclaim pursuant to Rule 12(e) of the Federal Rule of Civil Procedure necessary, in light of the fact that proof of special damages is not required in a slander per se case. Plaintiff's motion to dismiss defendants' third counterclaim or in the alternative to require defendants to amend their third counterclaim to provide a more definite statement will be denied.

Based on the foregoing, IT IS ORDERED:

1. plaintiff's motion to dismiss defendants' first counterclaim is granted;

2. plaintiff's motion to dismiss defendants' second counterclaim is granted;

3. plaintiff's motion to dismiss defendants' third counterclaim is denied.

---

**6.** In the *Prosser* hornbook the following approach to the issue was suggested:

> It is not always easy to distinguish between personal defamation of the plaintiff and disparagement of his property or business. If the statement made charges the plaintiff with personal misconduct, or imputes to him reprehensible characteristics, it is regarded as libel or slander; and since any such charge concerning his conduct of his business will affect him in that business, the slander is actionable without proof of damage. On the other hand, if the aspersions reflect only upon the quality of what he has to sell, or the character of his business as such, it is merely disparagement, and proof of damage is essential to the cause of action.

Prosser on Torts § 128 at 917–18 (footnotes omitted).