The MOUNTAIN GROVE CEMETERY ASSOCIATION

v.

The NORWALK VAULT CO. OF BRIDGEPORT, INC., et al.

Civ. No. B-75-391.

United States District Court, D. Connecticut.

March 11, 1977.

---

**26.** See note 15, *supra*.

Dion W. Moore, Pullman, Comley, Bradley & Reeves, Bridgeport, Alexander W. Samor, Trager & Trager, Fairfield, Conn., for plaintiff.

F. Timothy McNamara, Hartford, Conn., Lawrence J. Merly, Bridgeport, Conn., for defendants.

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTION TO DISMISS

NEWMAN, District Judge.

Defendants' motion to dismiss the complaint in this private antitrust suit raises an important question as to whether initiating litigation can be the basis for a claim of antitrust liability. Plaintiff, a non-stock Connecticut corporation, owns and operates a cemetery in Bridgeport, Connecticut. Defendants are Connecticut corporations engaged in either the manufacture and sale of burial vaults or funeral directing and undertaking, and two funeral directors' trade associations.[1]

The complaint alleges that defendants entered into an unlawful combination and conspiracy to restrict or prevent plaintiff from selling burial facilities using double depth lawn crypts. A double depth lawn crypt is a burial facility that uses large concrete crypts, each of which is constructed so as to accommodate two caskets separated by a concrete shelf.

Prior to August, 1975, plaintiff sold burial facilities consisting of single burial vaults. Thereafter plaintiff proposed to use the double depth lawn crypt system, and in order to do so, excavated and graded a large area of real estate, installed sub-surface drainage systems, and constructed 128 double depth crypts. Plaintiff claims that its innovation enables it to offer burial facilities at lower cost, and that use of double depth crypts conserves limited cemetery property, and allows use of property that would otherwise be unsuitable for burials.

Plaintiff contends that in connection with the construction of the double depth crypts, it solicited bids from defendant vault manufacturers, all of whom refused to deal with plaintiff. Moreover, plaintiff claims that defendant vault manufacturers and funeral directors joined together to boycott plaintiff and to disparage the design, construction, and use of double depth crypts, thereby discouraging plaintiff's potential customers. Furthermore, plaintiff alleges, in the claim attacked by the pending motion, that defendants joined together to initiate litigation against plaintiff in state court without cause and solely for the purpose of eliminating plaintiff as a competitor. Specifically, defendants have filed an action in

1. All defendants except the Norwalk-Wilbert Vault Co., Inc. joined in the motion to dismiss.

the Connecticut Superior Court, claiming that plaintiff's business violates various provisions of the Connecticut General Statutes, and that plaintiff is engaged in activities that restrain trade. Plaintiff alleges that defendants' acts constitute violations of §§ 1 and 2 of the Sherman Act.

Defendants contend that plaintiff cannot allege an antitrust violation on the basis of defendants' state court litigation against plaintiff because that action is immunized from antitrust regulation. This claim—that litigation between competitors cannot be a predicate for liability under the Sherman Act—is based on the general rule that the Sherman Act does not apply to concerted efforts to induce government to take lawful action, even if that action results in a restraint of trade. *Eastern Railroad Presidents Conference v. Noerr Motor*, 365 U.S. 127, 135–36, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). While conceding the existence of this general rule, plaintiff contends that the allegation in his complaint falls within an exception to the general rule, the so-called *Noerr* "sham exception." Resolution of this issue is governed by a line of cases beginning with *Eastern Railroad Presidents Conference v. Noerr Motor, supra.*

In *Noerr*, a group of trucking companies and their trade association sued a group of railroads, a railroad association, and a public relations firm, charging that the defendants had conspired to restrain trade in the long-distance freight business, in violation of §§ 1 and 2 of the Sherman Act. The truckers alleged, *inter alia*, that the railroads had engaged in a massive publicity campaign designed to foster the adoption and retention of laws destructive of the trucking business. The District Court entered a judgment for the plaintiffs. The Court of Appeals, Third Circuit, affirmed;

the Supreme Court granted certiorari and reversed. A unanimous Court held that no violation of the Sherman Act could be predicated on concerted efforts to influence the passage or enforcement of laws, even if the efforts are motivated by anti-competitive purposes, and have anticompetitive results.

The Court's reasoning began with two basic principles. First, that restraint of trade or monopolization that results from otherwise valid governmental action does not violate the Sherman Act. *Eastern Railroad Presidents Conference v. Noerr Motor, supra*, 365 U.S. at 135–36, 81 S.Ct. 523; *United States v. Rock Royal Co-Op*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); *Parker v. Brown, supra*. And secondly, that the right to petition for the passage or enforcement of laws is protected political activity that should not be regulated by the Sherman Act.

Both the District Court and the Third Circuit had relied upon the two "additional factors" [2] of the intent and methods [3] of the railroads' publicity campaign in concluding that a departure from these principles was justified. The Supreme Court, however, specifically rejected these two factors as insufficient to warrant application of the Sherman Act to the railroads' activities.

Although the *Noerr* decision seems to insulate a wide variety of anti-competitive activities from Sherman Act regulation, the Court suggested one qualification to its decision, thus giving rise to the *Noerr* "sham exception." Mr. Justice Black wrote, "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 533.

**2.** Mr. Justice Black characterized the intent and methods of the railroads' publicity campaign as "additional factors" that might be sufficient to take the case out of the area in which the general rule of antitrust exemption was controlling. 365 U.S. 127, 138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

**3.** The Supreme Court noted that the District Court had found that the railroads' publicity campaign involved "deception of the public, manufacture of bogus sources of reference, [a]nd distortion of public sources of information." *Id.* at 140, 81 S.Ct. at 531, quoting 155 F.Supp. 768.

The exception remained little more than a suggestion until 1972, when the Supreme Court decided *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In that decision, the Court upheld the sufficiency of a complaint that alleged a Sherman Act violation similar to the allegation in *Noerr*. In fact, the District Court had specifically relied upon *Noerr* in dismissing the complaint,[4] but the Supreme Court held that the complaint's allegations came within the *Noerr* "sham exception," as adapted to the adjudicatory process. The complaint alleged a concerted effort by defendants to institute state and federal proceedings to resist and defeat plaintiffs' applications to acquire operating rights for their trucking business. Plaintiffs alleged that defendants had harassed and deterred them in their use of administrative and judicial proceedings so as to deny them "free and unlimited access" to those tribunals, and that the result was that those agencies and courts were effectively closed to plaintiffs. The Supreme Court held that the allegations of the complaint stated a cause of action under the antitrust laws.

These two Supreme Court decisions, along with several cases from various Courts of Appeals, suggest the criteria that should be used for determining whether certain challenged business activity ought to be exempt from antitrust regulation, or whether it comes within the "sham exception."

The criterion suggested most strongly by those decisions is the impact of antitrust regulation on the First Amendment interests of the parties in the dispute. The common theme of the decisions is that in each case the Court vindicated the First Amendment right to petition the government. Application of the Sherman Act was withheld from the railroads' activities in *Noerr* so as not to discourage the free flow of information to the legislative branch,

even though the railroads' publicity campaign was deceptive and anti-competitive. The Sherman Act was extended to the truckers' activities in *California Motor Transport* in order to protect the smaller companies' access to administrative and judicial tribunals.

The two decisions reflect the Supreme Court's recognition that competitors engaged in a "no-holds barred fight"[5] will often find themselves waging their battle in a government forum—either in the political arena, as in *Noerr*, or before an administrative agency or court, as in *California Motor Transport*. When this occurs, the Supreme Court cases indicate that the proper application of antitrust regulation requires a balancing of the competing values so that the considerations underlying the Sherman Act do not override other values, such as the First Amendment right to petition.

A second criterion suggested by the cases is the nature of the activity claimed to be a sham. Although the *Noerr* decision describes the railroads' unethical conduct as "legally irrelevant," that characterization must be viewed in light of certain passages in *California Motor Transport*. In that case, Justice Douglas described several types of conduct which, if used as part of an effort to influence government action, could result in an antitrust violation. The specific practices cited were perjury, use of a fraudulent patent, illegal conspiracy, and bribery. Justice Douglas wrote, "[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations." *California Motor Transport, supra*, 404 U.S. at 513, 92 S.Ct. at 613.

The Tenth Circuit has interpreted this passage to mean that, in order for behavior to be within the sham exception, it must involve "fraud, corruption or misuse of the state processes." *Semke v. Enid Automobile Dealers Ass'n*, 456 F.2d 1361, 1366 (10th

---

4. 1967 Trade Cas. 72,298 (1967).

5. The phrase is Judge Biggs' from his dissent to the Court of Appeals decision in *Noerr*. 273 F.2d 218, 222 (3d Cir. 1959).

Cir. 1972). The Sixth Circuit has suggested that, in order to establish the sham character of a competitor's litigation, one would have to demonstrate that the litigation was not a "genuine" attempt to use the adjudicative process "legitimately." *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 228 (7th Cir. 1975). Similarly, the Fifth Circuit has held that the exemption from antitrust liability did not apply to an allegation that two natural gas producers had filed false nomination forecasts with the Texas Railroad Commission in order to reduce the production allowed their competitors. This false filing was characterized by the Fifth Circuit as an "abuse" of the administrative process that did not justify antitrust immunity. *Woods Exploration and Producing Co., Inc. v. Aluminum Company of America*, 438 F.2d 1286, 1298 (5th Cir. 1971).

These decisions indicate that, notwithstanding the Supreme Court's lack of concern over the unethical political activity of the railroads in *Noerr*, corrupt practices that abuse administrative or judicial tribunals can prompt the removal of antitrust immunity.

Another criterion is the frequency of the activities alleged to be a sham attempt to induce government action. In *California Motor Transport*, Justice Douglas described the activities that might corrupt the administrative or judicial process as a "pattern of baseless, repetitive claims." Similarly, one District Court that has found a company's litigation to come within the "sham exception" specifically characterized the disputed pattern of litigation as "repetitive." *United States v. Otter Tail Power Co.*, 360 F.Supp. 451 (D.Minn.1973). These cases indicate that the frequency of a business organization's litigation against a competitor is probative of the character of the activity.

■ Plaintiff's complaint about defendants' state court suit must be considered in light of the three criteria these cases suggest determine whether a lawsuit is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 533. These criteria are: (1) the impact of regulation on First Amendment values, (2) the nature of the challenged conduct, and (3) the frequency of its occurrence. In light of these criteria, plaintiff's complaint does not allege conduct that is within the sham exception.

■ Plaintiff claims that defendants' litigation is "baseless," but the foregoing cases indicate the insufficiency of that claim. Plaintiff has not alleged that defendants' state court lawsuit is tainted by any of the practices that have prompted courts to remove the cloak of antitrust exemption. If the litigation is indeed baseless, the Connecticut courts will be equal to the task of dealing with it accordingly. But absent an allegation that defendants' litigation involves conduct that at least approaches some abuse or corruption of the judicial process, it does not come within the sham exception.

Similarly, plaintiff's claim fails with regard to the criterion of frequency. The two decisions that provide the most encouragement to plaintiff, *California Motor Transport* and *Otter Tail*, specifically refer to "repetitive" claims. Defendants here are accused of filing only a single lawsuit.

Finally, if one examines the impact of antitrust regulation on the First Amendment interests at stake in the pending case, it is clear that the motion to dismiss must be granted. Although the conduct involved lacks the political value of the activity involved in *Noerr*, removal of the antitrust exemption under the circumstances of this case would have undesirable effects on First Amendments interests.

■ If the institution of a single lawsuit could be the predicate for an antitrust violation, without any allegation that the suit involves misconduct similar to the abuses described in *California Motor Transport*, then no business organization could seek a judicial determination of its rights *vis-a-vis* a competitor without assessing the antitrust

**956**

implications of its contemplated legal action. *Noerr* and *California Motor Transport* teach that when antitrust objectives, and the right to petition for government action are in conflict, the scales must tip in favor of the First Amendment.

This same consideration makes it especially appropriate to test the sufficiency of plaintiff's attack on the defendants' state court suit at the pleading stage of this litigation. The right to pursue a claim in a state court action would be unduly impaired if the state court plaintiff had to be subjected to protracted pre-trial discovery and perhaps even trial in an antitrust suit before the antitrust immunity of his state court suit was established. The right to litigate, like speech itself, needs some breathing room. The antitrust pleader who fails to allege circumstances indicating that the suit against him is clearly within the *Noerr* "sham exception," must expect his claim to fail at the outset.

The precise contours of the *Noerr* "sham exception" may evade definition because of the variety of commercial contexts in which the issue may arise. But however its limits are ultimately defined, the allegation in the pending case falls outside the scope of the exception. Accordingly, the motion to dismiss is granted to the extent that plaintiff's complaint alleges an antitrust violation on the basis of defendants' state court litigation.

The remaining issues have been dealt with in a separate memorandum of decision made available to counsel for the parties.