**AIRCAPITAL CABLEVISION, INC., and Multimedia Cablevision, Inc., Plaintiffs,**

v.

**STARLINK COMMUNICATIONS GROUP, INC., and Jeffry L. Manion, Defendants.**

No. 83–1997–K.

United States District Court, D. Kansas.

May 6, 1986.

R. Bruce Beckner of Dow, Lohnes & Albertson, Washington, D.C., Robert Martin of Martin, Pringle, Oliver, Triplett & Wallace, Wichita, Kan., for plaintiffs.

Lauritz S. Helland, of Brown & Finn, Washington, D.C., Donald R. Newkirk of Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case is before the Court on plaintiffs' motion for summary judgment on defendant Starlink's counterclaims. Plaintiffs AirCapital Cablevision, Inc. and Multimedia Cablevision, Inc. (Multimedia) filed suit against Starlink Communications Group, Inc. (Starlink) claiming Starlink's sale of home earth stations violated the Communications Act and infringed on copyrights. Starlink counterclaimed, alleging Multimedia's lawsuit was a mere "sham" instigated solely to drive Starlink out of business, and as such, was a violation of the Sherman Act. The claims were bifurcated. In February of 1985, Starlink's motion for summary judgment as to Multimedia's claims was granted by this Court. However, Starlink continued to assert its antitrust claims against Multimedia. Multimedia has now moved for summary judgment, claiming their action in filing the lawsuit was a valid exercise of their First Amendment rights and is protected by the *Noerr-Pennington* doctrine.

For the reasons set forth below, the Court finds the lawsuit brought by Multimedia against Starlink, along with its incidental publicity, was activity protected by the *Noerr-Pennington* doctrine. Therefore, Multimedia's motion for summary judgment is granted.

## I. *Prior Litigation*

On November 14, 1983, Multimedia filed a complaint alleging, in 18 counts, that Starlink, a small Kansas retailer of satellite earth station equipment, had violated Section 605 of the Communications Act of 1934, and Sections 106, 111 and 501 of the Copyright Act of 1976, by selling satellite earth station equipment to consumers in the Wichita, Kansas market. Multimedia owns an exclusive cable franchise in the Wichita area. In order to receive and retransmit satellite programming, Multimedia pays fees to various satellite program suppliers (such as HBO). Starlink customers pay nothing to the satellite program suppliers. In its suit, Multimedia sought to enjoin Starlink from selling earth stations, and also prayed for damages.

Starlink denied all liability and counterclaimed under the Sherman Antitrust Act, 15 U.S.C. § 2, alleging Multimedia's lawsuit and its attendant publicity was an attempt to monopolize the provision for facilities for making satellite-delivered signals available to consumers. Starlink claimed the lawsuit was a mere "sham", brought with the sole intent of eliminating Starlink as a competitor. Starlink prayed for treble damages, but not attorney fees.

During the two months following Multimedia's filing of its claim, numerous articles appeared in various newspapers publicizing the lawsuit. Multimedia's agents were quoted as saying Multimedia had plans to sue individual buyers of home earth stations. Starlink's business decreased as a result of the pending lawsuit and the publicity. Starlink suffered a loss of $90,396.00 in 1984, was denied at least two loans, and lost an unknown number of potential customers. However, Starlink was never forced out of business.

In 1984, the Communications Act of 1934 was overhauled by Congress. The amended act clearly establishes the legality of selling and owning satellite earth stations.

On February 13, 1985, this Court granted Starlink's motion for summary judgment. In the memorandum order, this Court discussed Starlink's liability under the former

§ 605 at length, finding Multimedia had no standing to sue under that act as Starlink was not "intercepting" any of Multimedia's signals, but was receiving the signals directly. The Court denied Multimedia's motion to reconsider the order on May 23, 1985.

## II. *Present Antitrust Action*

Starlink bases its present antitrust claims against Multimedia on the action previously brought by Multimedia against Starlink for violation of the Communications Act. Starlink alleges the action, along with the publicity, was instituted for the purpose of eliminating competition and perpetrating Multimedia's monopoly in the satellite signal receiving business, and that the earlier action was a mere "sham".

Multimedia claims its lawsuit against Starlink, as well as any incidental publicity, is protected from antitrust scrutiny by the *Noerr-Pennington* doctrine. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171 (10th Cir.1982); *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.,* 674 F.2d 1252, 1263 (9th Cir.1982).

This doctrine was developed in three principal Supreme Court cases, beginning with *Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In *Noerr,* a group of trucking companies sued their competitors, a group of railroads, for violations of the Sherman Act. Their antitrust claims were premised on the railroads having conducted a "publicity campaign against truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers." *Noerr,* 365 U.S. at 129, 81 S.Ct. at 525. In reversing the judgment holding that the railroads' campaign had violated the antitrust laws, the Supreme Court held that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, *its legality was not at all affected by any anti-competitive purpose it may have had."* 365 U.S. at 139–40, 81 S.Ct. at 530–31 (emphasis added). Prior to so ruling, the court had observed that "it is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." 365 U.S. at 139, 81 S.Ct. at 530. The court further found that a contrary construction of the Sherman Act not only would deprive public officials of valuable sources of information on matters affecting their decision making, but also would deprive people of their right to petition with regard to issues significantly affecting their own interests.

The antitrust immunity established in *Noerr* was reaffirmed and expanded in scope in the case of *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In cooperation with union officials, several large coal companies attempted to eliminate competition from smaller coal companies by persuading the Secretary of Labor to set a higher minimum wage for companies selling coal to the Tennessee Valley Authority. In reversing a jury verdict for the smaller coal companies, the Supreme Court stated: "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593.

Seven years later the Supreme Court extended the immunity from antitrust liability to the administrative and judicial processes. In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, a group of highway carriers had allegedly conspired to deter competitors from obtaining new or expanded operating rights from the California Public Utilities Commission by opposing every such appli-

cation, regardless of its merits. Writing for the court, Justice Douglas stated that the immunity formed by the *Noerr-Pennington* doctrine was grounded in the First Amendment rights of association and petition. Although the court extended the scope of the antitrust immunity, the court stressed that the doctrine was not an absolute immunity without exception. "We said ... in *Noerr* that there may be instances where the alleged conspiracy is 'a mere sham to cover what is actually nothing more than an attempt to interfere with business relationships of a competitor and the application of the Sherman Act would be justified.'" 404 U.S. at 511, 92 S.Ct. at 612, quoting *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. The court did not attempt, however, to define the perimeters of the sham exception. The court did state that misrepresentations, condoned in the political arena, are not immunized in the adjudicatory process, and that a conclusion of sham activity may result from the finding of wrongful conduct such as inducing the perjury of witnesses, the use of a patent obtained by fraud, or the bribery of a public purchasing agent. The court further stated that there are other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in a finding of "sham", such as a pattern of baseless, repetitive claims indicating abuse of the administrative or judicial processes culminating in the illegal result of effectively barring competitors from meaningful access to adjudicatory tribunals. The court explained that such subversion of the administrative or judicial process cannot acquire antitrust immunity as "political expression," since First Amendment rights may not be used as the means or pretext for achieving "substantive evils."

Two years later, in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, the court summarily affirmed a district court's finding that an electric company's repeated use of litigation principally to prevent the establishment of competing municipal power systems came within the sham exception. In *Otter Tail,* the court reaffirmed the application of the *Noerr-Pennington* doctrine and the attendant sham exception in the judicial setting.

The sham exception, first recognized in *Noerr* and confirmed in *California Motor,* has been held to be a narrow exception and applies only where the activity in question is *nothing more than* a direct restraint on competitors. *See Mid-Texas Communications v. American Tel. & Tel. Co.,* 615 F.2d 1372, *cert. denied* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980); *Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. 951 (D.Conn.1977). It is clear that a defendant's invocation of the adjudicative process to press *legitimate* claims is protected *even though* its purpose in doing so is to eliminate competition. *Noerr,* 365 U.S. at 140, 81 S.Ct. at 531; *Pennington,* 381 U.S. at 669, 85 S.Ct. at 1592–93. In *Razorback Ready Mix Concrete Co., Inc. v. Weaver,* 761 F.2d 484, 487 (8th Cir.1985), the Eighth Circuit stated:

> The constitutional right of petition, of which the right of access to the courts is but a part, would be seriously undermined if mere improper purpose in bringing a suit—such as the desire to eliminate or injure a competitor by requiring it to defend an otherwise meritorious action—gave rise to antitrust liability.... *It is only where a defendant's resort to the courts is accompanied by or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process, that the Noerr-Pennington cloak of immunity provides no protection.*

Quoting *Chest Hill Co. v. Guttman,* 1981–2 Trad.Cas. (CCH) ¶ 64,417 (S.D.Ohio May 29, 1981) (emphasis added).

The Tenth Circuit's definition of "sham" is in accord with *Razorback.* In *Hydro-Tech Corp. v. Sundstrand,* 673 F.2d 1171 (10th Cir.1982), the court stated: "The term 'sham' means misuse or corruption of the judicial process. The filing of a lawsuit 'without probable cause' and with an anti-

competitive intent simply does not come up to the standard set by the Supreme Court in *California Motor Transport.*"

Starlink argues that whether the "sham" exception applies is purely a question of fact, and improper for resolution in this motion for summary judgment. Starlink relies on *Colo. Petro. Marketers Assn. v. Southland Corp.,* 476 F.Supp. 373 (D.Colo. 1979), as authority that the question of "sham" is a question of fact. However, in that case the plaintiff's motion for summary judgment, which alleged immunity under the *Noerr-Pennington* doctrine, was made prior to the adjudication of the predicate lawsuit. The court refused to grant summary judgment, stating: "The question whether such an action is nothing more than an attempt to interfere directly with the business relationships of a competitor can be answered only after careful evaluation and consideration of all the facts and circumstances giving rise to the primary lawsuit brought by the plaintiffs." 476 F.Supp. at 379. The Colorado court went on to say that the Tenth Circuit has recognized that the question of "sham" is a question of fact. However, the Tenth Circuit has never been faced with this question. The Tenth Circuit has applied the *Noerr-Pennington* doctrine in three cases. *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171 (10th Cir.1982); *Webb v. Utah Tour Brokers Assn.,* 568 F.2d 670 (10th Cir.1977); *Semke v. Enid Auto Dealers Assn.,* 456 F.2d 1361 (10th Cir.1972). None of these cases were before the court in summary judgment context. In the most recent of the Tenth Circuit cases— *Hydro-Tech*—decided three years after *Colorado Petroleum Marketers,* the court upheld the district court's dismissal of defendant's antitrust allegations on the pleadings based on the *Noerr-Pennington* doctrine even though the defendant had alleged the plaintiff's conduct fell within the "sham exception." In so doing, the court noted there was some dispute as to whether the district court had transformed the motion to dismiss into a motion for summary judgment. Thus, the Tenth Circuit has never held that the question of "sham" is a

question of fact which cannot be resolved by summary judgment.

In fact, many courts have found that the sham exception does or does not apply in a summary judgment decision. *See, e.g., Ottensmeyer v. Chesapeake & Potomac Telephone Co.,* 756 F.2d 986 (4th Cir.1985); *Greenwood Utilities v. Mississippi Power Co.,* 751 F.2d 1484 (5th Cir.1985). For example, in *Razorback Ready Mix Concrete Co., Inc. v. Weaver,* 761 F.2d at 487, the court held the sham exception was inapplicable *as a matter of law* even though Razorback argued that whether the sham exception applies is purely a question of fact.

The gist of the case at bar turns on documentary evidence and involves conclusions of law (Multimedia terms this an issue of "ultimate fact"). Discovery has been completed and the facts are undisputed. Summary judgment is appropriate in antitrust cases where the antitrust plaintiff can offer only vague and conclusory charges. However, where motive and intent and a myriad of other factual issues may grow from an antitrust allegation, summary judgment should be used with caution. *Western Systems, Inc. v. Dynatech Corp.,* 610 F.Supp. 585 (D.Colo.1985). Motive and intent are not an issue under the *Noerr-Pennington* doctrine (discussed *infra*). Moreover, where First Amendment values are at stake (as in *Noerr-Pennington* cases), the validity of antitrust allegations are to be carefully scrutinized. *Federal Prescription Service v. Am. Pharm. Assn.,* 471 F.Supp. 126, 129 (D.D. C.1979). "When antitrust objectives and the right to petition for government action are in conflict, the scales must tip in favor of the First Amendment." *Mountain Grove Cemetery v. Norwalk Vault Co.,* 428 F.Supp. at 956. Accordingly, the issues in this case—specifically whether the lawsuit was an unprotected "sham"—may properly be resolved by summary judgment.

Multimedia asserts that this Court must decide a "threshold legal issue" of whether the filing of a single lawsuit is ever enough

to invoke the "sham exception" to the *Noerr-Pennington* doctrine.

In *California Motor Transport*, the Supreme Court applied the "sham exception" to litigation which constituted a "pattern" of baseless, repetitive claims. 404 U.S. at 513, 92 S.Ct. at 613. The Supreme Court has not yet decided whether the filing of one sham lawsuit is conduct subject to the "sham exception." Several courts have construed the "pattern" language of that case to mean that a single lawsuit will not fit within the "sham exception." *See Central Bank of Clayton v. Clayton Bank*, 424 F.Supp. 163 (E.D.Mo.1976); *Mountain Grove Cemetery Assn. v. Norwalk Vault Co.*, 428 F.Supp. 951 (D.Conn.1977).

The question of the applicability of the "sham exception" to a single lawsuit was considered by some members of the Supreme Court in *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977). A footnote to the plurality opinion indicated that the filing of a single lawsuit might be sufficient to give rise to a cause of action within the "sham exception" to the *Noerr-Pennington* doctrine. 433 U.S. at 635–36, n. 6, 97 S.Ct. at 2889–90, n. 6. In a concurring opinion, Justices Blackmun and Burger stated that one lawsuit is not sufficient to fall within the sham exception and that there must be a pattern of baseless, repetitive claims. 433 U.S. at 643, 97 S.Ct. at 2893. A dissenting opinion written by Justice Stevens and joined by Justices Brennan, White and Marshall took the position that a single lawsuit could violate the antitrust laws.

In analyzing this decision, several courts have concluded a majority of the Court would hold that one vexatious or baseless suit would be sufficient to state a cause of action under the Sherman Act. *See, e.g., Energy Conservation, Inc. v. Heliodyne*, 698 F.2d 386 (9th Cir.1983); *Technicon Medical Info. v. Green Bay Packaging*, 480 F.Supp. 124, 127–28 (E.D.Wisc.1979); *Colo. Petro. Marketers Assn. v. Southland Corp.*, 476 F.Supp. at 378; *Cyborg Sys., Inc. v. Management Science America, Inc.*, 1978–1 Trade Cas. ¶ 61,927 (N.D.Ill.

1978); *see also Noerr-Pennington-Sham Exception*, 71 A.L.R.Fed. 723, 745–50.

The Tenth Circuit expressly reserved judgment on this issue in *Hydro-Tech*, 673 F.2d at 1173, and decided the case on another ground (i.e., the allegation that a lawsuit was filed without probable cause and with anticompetitive intent was inadequate to state a cause of action under the antitrust laws). However, the court cited with approval *First Nat'l Bank of Omaha v. Marquette Nat'l Bank of Minneapolis*, 482 F.Supp. 514, 520–21 (D.Minn.1979), *aff'd* 636 F.2d 195 (8th Cir.1980), *cert. denied* 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981), in which the Minnesota court found that the institution of a single lawsuit does not give rise to a cause of action under the antitrust laws *absent* allegations that the lawsuit involved ethical misconduct similar to the abuses described in *California Motor Transport*. 673 F.2d at 1177, n. 7. It thus appears that the Tenth Circuit would follow this approach.

Similarly, the Eighth Circuit in *Razorback Ready Mix* rejected a strict reading of the "pattern" language of *California Motor Transport*, stating that a single lawsuit does not give rise to liability "absent allegations that the lawsuit involves serious misconduct similar to the ... abuses described in *California Motor*." 761 F.2d at 487. *See also Surgidev Corp. v. Eye Technology, Inc.*, 625 F.Supp. 800, 804–05 (D.Minn.1986).

■ Accordingly, it appears that a single lawsuit may come within the "sham exception," but only if it involves a serious abuse, misuse, or corruption of the judicial process.

Starlink claims that even under this analysis, Multimedia's suit was a "sham" as their sole motive in filing the suit was to force Starlink out of business—not to obtain a judicial determination of the earth station business. However, this Court has previously stated its belief that the AirCapital litigation was not a sham:

Certainly at the time it [the suit] was filed in my view should not be treated as

a sham. It was the kind of question that has to be tested in the Court. I haven't any problem with that from what I have garnered in conference with lawyers.

\* \* \* \* \* \*

I haven't any problem with saying to you that the filing the case, the position at least of the plaintiffs was fair game and probably good faith, and right to test it. After all, you can say you have the monopoly here, you have the cable here, these folks are infringing on your right. Only way to find out what your rights are is to file it and let some judge tell you or the Tenth Circuit tell me. I don't see any—I don't see that as a sham, if that is your problem.

Transcript, Motion to Amend Judgment, May 6, 1985, at 35–36.

■ As previously stated, in the predicate lawsuit Multimedia sought to enjoin Starlink from selling home earth stations. Multimedia alleged that the satellite signals for which Multimedia had to pay were protected from unauthorized interception by § 605 of the Communications Act of 1934, 47 U.S.C. § 605; that the reception of these signals by the earth station users was an unlawful "interception"; and that Starlink could not lawfully sell or distribute this equipment. Multimedia also asserted that the sale of such equipment violated the Copyright Act of 1976. Two months after filing its claim, Multimedia moved for dismissal of its Copyright Act claims—this motion was granted on February 29, 1984. Multimedia claims its motion to dismiss was due to the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), wherein the court held that the seller of VCRs could not be held liable for copyright infringement by consumers. Starlink, on the other hand, claims that Multimedia knew all along that only the holder of a copyright has standing to sue for infringement and, therefore, Multimedia had no standing in this case. Starlink argues that this, in itself, shows that Multimedia's claims were "sham". However, this argument overlooks the fact that Multimedia's § 605 claim was brought in good faith. Therefore, even if the infringement claims were included spuriously, the lawsuit does not become "sham" for this reason alone.

Subsequent to the filing of Multimedia's lawsuit against Starlink, Congress passed the Cable Act of 1984, which precluded Multimedia's ability to obtain injunctive relief under § 605. The new act clearly created potential legal uses for satellite receiving equipment by consumers. It has been clearly established that if a suit is not a "sham" when filed, a subsequent change in the law which causes the plaintiff to lose will not affect *Noerr-Pennington* protection. *Adolph Coors Co. v. A & S Wholesalers*, 561 F.2d 807 (10th Cir.1977); *Greenwood Utilities Comm. v. Mississippi Power Co.*, 751 F.2d 1484 (5th Cir.) *reh. denied* 757 F.2d 284 (1985). Moreover, the fact that Congress saw a need to amend the Act to protect earth station equipment users and sellers indicates the old act left open the question of their legality.

This Court granted summary judgment to Starlink on February 13, 1985. In the Memorandum and Order, this Court discussed at length whether former § 605 would have operated to prohibit Starlink's sale of the earth station equipment. After discussing and distinguishing other recent § 605 cases which prohibited the manufacture, distribution and sale of electronic decoding equipment that enabled home viewers to intercept transmission from cable TV distributors, the Court held the cable company did not have an "exclusive" right to receive video signals. Starlink did not "intercept" the cable company's transmission, but rather, received the signals directly; the companies had collateral rights and the cable company had no standing to claim a violation under § 605. This Court obviously felt there was enough merit in Multimedia's § 605 claim to discuss it at length.

Other federal courts have already disagreed with this Court's holding in *AirCapital*. In *American Television & Communications Corp. v. Floken, Ltd.*, 629 F.Supp. 1462 (M.D.Fla.1986), the court, in is-

suing a preliminary injunction, held that a cable company does have standing under § 605 and that satellite transmissions are entitled to protection under that section. *See also National Football League v. McBee & Bruno's*, 621 F.Supp. 880 (E.D.Mo.1985). Moreover, Judge Theis held that AirCapital had standing to sue a distributor of an earth station satellite dish under former § 605 in *AirCapital Cablevision v. Crest Antenna Systems, Inc.*, No. 81–1436 (D.Kan. June 30, 1982).

■ Based on all of the foregoing, it is clear that Multimedia's lawsuit was not a "sham". Multimedia's lawsuit was not abusive of the judicial process, nor was it "nothing more" than an attempt to interfere with the business relationships of its competitor. *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533.

Starlink argues that even if Multimedia's suit was of "colorable" merit, it was initiated primarily as a predatory attempt to interfere in the relationship between Starlink and its customers. Starlink points to the fact that Multimedia had, at one time, actively considered entering the home earth station market itself. Starlink claims this indicates Multimedia believed the business was legal. However, Multimedia was already paying to receive these satellite transmissions; therefore, rerouting them to their customers through cable or allowing their customers to receive them directly would seemingly have made no difference. Starlink also points to the fact that by asking for over 10 million dollars in damages, Multimedia meant to scare Starlink into a settlement, thereby forcing them out of business.

■ Multimedia admits that by seeking the Court's determination of the legality of Starlink's activities it hoped to achieve a favorable verdict and thereby put Starlink out of business. This was an anticompetitive motive. However, since the lawsuit was not a sham, Multimedia's motive was immaterial. *Hydro-Tech*, 673 F.2d at 1177 ("the filing of a lawsuit without probable cause and *with an anticompetitive intent* simply does not come up to the standard

set by the Supreme Court in *California Motor Transport*." (Emphasis added)). As the Eighth Circuit stated in *Razorback*, 761 F.2d at 488, "Defendant's motive may have been selfish or altruistic or mixed; that is immaterial. Regardless of motive, defendant's actions are clearly within the ambit of First Amendment protection and of *Noerr-Pennington* immunity from the antitrust laws." The only inquiry is whether Multimedia's lawsuit was a "genuine attempt to secure a decision" on a nonfrivolous claim. *Adolph Coors Co.*, 561 F.2d at 812. As stated earlier, Multimedia's suit was clearly not a "sham". Undoubtedly Multimedia wanted to secure a favorable decision from this Court. Therefore, any anticompetitive motive it had in bringing the action is immaterial.

Starlink argues that even if Multimedia's action in filing the lawsuit is protected by the *Noerr-Pennington* doctrine, the incidental publicity aimed at Starlink's customers was not protected activity and was violative of the antitrust laws.

The AirCapital suit was filed on November 14, 1983. During November and December of 1983, the following items appeared in the press publicizing the lawsuit:

1. Press release issued by Multimedia on day of lawsuit: "AirCapital and Multimedia intend to demand a list of customers who have purchased satellite dishes from Starlink and will consider the prospect of joining those individuals as additional defendants in the lawsuit. AirCapital and Multimedia also intend to explore the possibility of instituting similar lawsuits against other local retailers of dish antennas and their customers in the near future."

2. KAKE–TV, November 14, 1983: "Meanwhile cablevision lawyers planned to make Manion give them a variety of inside information on his business, including a list of customers. Attorney David Williams says the cable company is thinking about suing individual satellite dish owners in the Wichita area, but he won't say if any final decision has been reached."

3. Wichita Eagle-Beacon, November 15, 1983: "Multimedia's lawsuit says

that earth station owners pirate the satellite broadcasts without paying for them and that the people who sell the stations know consumers will do that. In the future the suit may be expanded to include dish owners, Multimedia's lawyers said."

4. Hutchinson News, November 26, 1983: "At some point, said Multimedia's attorney David A. Williams, people who own earth stations could be included in the lawsuit."

5. Wichita Eagle-Beacon, December 24, 1983: "Friday, Sbarra said the cable companies are still considering bringing antenna owners into the suit.

"You go out and buy a dish, you point it to the sky and pick up those [proprietary] signals, you're violating the law, Sbarra said. If we know you're doing that, we might just decide to prosecute you."

6. Kansas City Times, November 16, 1983: "In one of the first lawsuits of its kind, a Wichita cable company claims that people who use home dish antennas to get free television programs from Home Box Office and other channels broadcast by satellite are stealing from cable television companies."

7. Multichannel News, November 28, 1983: "AirCapital and Multimedia said they plan to demand a list of Starlink's customers and 'will consider the prospect of joining those individuals as additional defendants.' The cable company operators said further they intend to explore the possibility of instituting similar lawsuits against other local retailers of dishes and their customers."

8. Cablevision, December 12, 1983: "Two cable companies plan to sue the buyers as well as the sellers of satellite receiving equipment used to intercept their signals, in a lawsuit the rest of the industry will be watching closely ... Multimedia president Donald Sbarra said that his attempt also to sue the buyers of dishes 'may be unprecedented,' but as he sees it 'the customers are potentially as guilty as the dealers.' "

9. The following statements appeared in the March 1984 edition of The Wichi-

tan: "Meantime, Sbarra has threatened to prosecute dish owners who are enjoying his 'proprietary signals' like HBO, etc. 'People are buying dishes to watch programming that's on cable that they think they can get for free,' Sbarra argues, 'The reason we brought suit is very basic. It violates the damn law.'

"Will he haul hundreds of Sedgwick County's satellite dish owners into federal courts as defendants in the Starlink case?

" 'That is a distinct possibility,' Sbarra says convincingly. 'You can quote me on that. That is a distinct possibility.' "

Starlink was quoted denying their culpability in most of these articles.

■ Clearly, Multimedia was engaging in bully-type conduct and undoubtedly Starlink's business was hurt as a result. Although Multimedia would have been better advised to have refrained from making such comments, this shortlived publicity and its indirect threats against Starlink's customers were incidental to the lawsuit. Therefore, the publicity is also protected by the *Noerr-Pennington* doctrine.

Starlink has cited several cases wherein threats against a competitor's customers were found to be unprotected and violative of the antitrust laws. However, these cases are distinguishable.

In *Kobe v. Dempsey,* 198 F.2d 416 (10th Cir.1952), the plaintiff brought suit alleging infringement of patents and unfair competition. Many years preceding the filing of the infringement suit, Kobe had created a patent pooling arrangement whereby licensees were required to assign future inventions or patents. Prior to Dempsey's appearance on the market, Kobe had a complete monopoly of the business relating to hydraulic pumps for oil wells. Kobe filed the infringement suit with "no concrete information that the Dempsey pump infringed any of Kobe's patents." 198 F.2d at 424. The complaint was later amended to include a "groundless" cause of action in which unfair competition was alleged. No serious attempt was made to sustain this charge. The trial

court dismissed it and no appeal was taken. After the suit was filed, customers were to be advised, by Kobe's salesmen, that the suit had been filed and that in all probability the litigation could not be disposed of short of two years. Kobe sent letters to all major purchasers advising them of the suit. As a result, Dempsey's business was brought to a standstill. Dempsey counterclaimed under the Sherman Act. The trial court held Kobe guilty of unlawful monopolization. In affirming on appeal, the Tenth Circuit found Kobe's pooling contracts, and the conduct of their business, constituted a violation of the Sherman Act in and of themselves. Kobe argued that even though it may have been guilty of monopolistic practices, such practices did not reach the defendants until the filing of the infringement action, and to allow recovery of damages would be tantamount to a denial of free access to the courts. On this point, the Tenth Circuit Court held:

> We have no doubt that if there was nothing more than the bringing of the infringement action, resulting damages could not be recovered, but this is not the case ... [T]he real purpose of the infringement action and the incidental activities of Kobe's representatives was to further the existing monopoly and to eliminate Dempsey as a competitor. *The infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused,* but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme.

198 F.2d at 425 (emphasis added). The court also noted, "The right of those who conduct their businesses in a lawful manner and who do not misuse their patent rights to bring infringement suits and to notify others of infringement will in no way be impaired by this ruling." 198 F.2d at 425.

*Kobe* is clearly distinguishable from the case at bar where there was no unlawful monopolistic conduct prior to filing the suit. Also, in *Kobe* notices of the suit were sent *directly* to the competitor's customers. Even so, the court noted that this activity would have been protected if it had not been for Kobe's earlier unlawfully monopolistic practices. Note that the *Kobe* case was decided prior to the emergence of the *Noerr-Pennington* doctrine.

In *Alexander v. National Farmers Org.,* 687 F.2d 1173 (8th Cir.1982), *cert. denied* 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983), after filing a lawsuit against NFO alleging antitrust violations, the plaintiffs engaged in a broad pattern of litigation threats and harassment against NFO's customers. The court found that although the lawsuit itself was protected by the *Noerr-Pennington* doctrine, the conduct toward NFO's customers clearly constituted bad faith, unlawful harassment. The plaintiffs wrote threatening letters to NFO's customers. One such customer stated, "They [plaintiffs] told me that you buy milk from NFO and you are going to get yourself involved in some kind of a lawsuit spending all sorts of time involving yourself ..." 687 F.2d at 1202. The plaintiffs in fact did sue one of NFO's customers. The court found this suit was baseless and was a mere "springboard for threatening" other customers. The court also found substantial evidence that the plaintiffs' practice of threatening and harassing NFO's customers was planned as a strategy at board meetings. As a result of the plaintiffs' threats, NFO's customers discontinued buying from NFO. The court found that "when this pattern of litigation, threats of litigation and related harassment" toward the competitor's customers was "viewed as a whole," it was clearly outside the *Noerr-Pennington* exemption. 687 F.2d at 1203. However, the court specified, "There may be circumstances in which actions against a competitor's customers are in good faith." 687 F.2d at 1200.

Also, in *Prelin Industries, Inc. v. G & G Crafts, Inc.,* 357 F.Supp. 52 (W.D.Okla. 1972), and *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 460 F.Supp. 1359, 1386 (D.Haw.1978), the threats of litigation were

made *directly* to the competitor's customers. However, to the extent *Oahu Gas* holds that threats of litigation directed to the customers are *per se* unprotected, the court declines to follow it, as there is no precedent for such a decision.

In the case at bar, any threats of litigation against Starlink's customers were indirectly made. Moreover, if this Court had found that Starlink was unlawfully intercepting the satellite signals under § 605, Multimedia might have been able to sue the customers as "competitors" for the satellite signals. If resort to the courts is protected by *Noerr-Pennington,* then threats to do so, without more, are likewise immune from liability. *Rohm & Haas Co. v. Dawson Chemical Co., Inc.,* 557 F.Supp. 739 (S.D.Tex.1983). The Fifth Circuit, in *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358 (5th Cir.1983), held that well-publicized threats against a competitor's customers, when it had been stipulated that the underlying litigation was not "sham", were protected by the *Noerr-Pennington* doctrine. The court stated that *Alexander v. NFO,* 687 F.2d 1173, was not contrary to this result and declined to follow *Oahu Gas,* 460 F.Supp. 1359. Likewise, in the case at bar the underlying litigation was not "sham"; therefore, the attendant publicity is protected by *Noerr-Pennington. See also Consortium, Inc. v. Knoxville Intern. Energy Expo.,* 563 F.Supp. 56 (E.D.Tenn.1983); *Outboard Marine Corp. v. Pezetel,* 474 F.Supp. 168, 174 (D.Del. 1979); *Pennwalt Corp. v. Zenith Labs, Inc.,* 472 F.Supp. 413, 424 (E.D.Mich.1979); *Clairol, Inc. v. Boston Discount Ctr. of Berkeley, Inc.,* 1976-2 Trade Cas. (CCH) ¶ 61,108 (E.D.Mich.), *aff'd on other grounds* 608 F.2d 1114 (6th Cir.1979).

Multimedia's conduct in bringing suit against Starlink and publicizing the same was activity protected under the First Amendment by the *Noerr-Pennington* doctrine. The lawsuit did not fall within the "sham exception" as a matter of law. At the time the suit was filed, Multimedia and Starlink were on a collision course and litigation challenging their respective rights was imminent. While the *Noerr-Pennington* doctrine evolved from antitrust claims,

the First Amendment rights it protects are equally applicable to each of Starlink's claims for tortious interference with contractual rights. *WCCB–TV, Inc. v. Telerep, Inc.,* 601 F.Supp. 284 (N.D.N.C.1984); *Pennwalt Corp. v. Zenith Labs, Inc.,* 472 F.Supp. 413.

IT IS THEREFORE ORDERED this 6 day of May, 1986, that summary judgment is granted to Multimedia Cablevision, Inc. and AirCapital Cablevision, Inc. as to all of Starlink's claims.